Argued and submitted August 20, reversed and remanded November 17, 2021

# OREGON DEPARTMENT
# OF FISH AND WILDLIFE,
*Respondent,*

*v.*

# CROOK COUNTY
## and West Prineville Solar Farm, LLC,
*Petitioners.*

### Land Use Board of Appeals
### 2020114; A176344

504 P3d 68

Petitioners West Prineville Solar Farm LLC (Solar Farm) and Crook County seek judicial review of an order of the Land Use Board of Appeals (LUBA) that remands to Crook County its decision approving Solar Farm's application made under ORS 215.446 for a midsize solar facility. Petitioners assert that LUBA misconstrued what ORS 215.446 requires by concluding that a mitigation plan must include submittal requirements set out in OAR 635-415-0020(8). Respondent Oregon Department of Fish and Wildlife (ODFW) argues that the text of ORS 215.446 requires that all the rules of its mitigation policy, including OAR 635-415-0020(8), apply to mitigation plans. *Held*: Counties approve applications made under ORS 215.446 and, because OAR 635-415-0020(8) concerns ODFW's own approval process, LUBA erred in concluding that Solar Farm's mitigation plan must include OAR 635-415-0020(8)'s submittal requirements.

Reversed and remanded.

John R. Eisler argued the cause and filed the brief for petitioner Crook County.

Merissa A. Moeller argued the cause for petitioner West Prineville Solar Farm, LLC. Also on the brief were Timothy L. McMahan, Crystal S. Chase, Max M. Yoklic, and Stoel Rives LLP.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

John Maxwell Greene filed the brief *amicus curiae* for Renewable Northwest.

Damien R. Hall and Ball Janik LLP, and Elaine R. Albrich and Davis Wright Tremaine LLP filed the brief *amicus curiae* for Oregon Solar Energy Industries Association.

Ellen H. Grover, Megan K. Beshai, and Karnopp Petersen LLP filed the brief *amicus curiae* for Community Renewable Energy Association.

Before Tookey, Presiding Judge, and James, Judge, and Aoyagi, Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

Petitioner West Prineville Solar Farm, LLC (Solar Farm) applied to petitioner Crook County for approval of a modification to an existing conditional use permit (CUP) for a solar photovoltaic facility, seeking to increase the facility size from 320 acres to 654 acres on nonarable land. Solar Farm's permit-modification application was made under ORS 215.446, which is a recently enacted statute that provides standards regarding wildlife mitigation for counties to apply when determining whether to authorize midsize solar facilities, *i.e.*, solar facilities sized between 321 acres and 1,920 acres. Crook County approved the application, but the Oregon Department of Fish and Wildlife (ODFW or the department) appealed that decision to the Land Use Board of Appeals (LUBA), contending that Solar Farm failed to include in its mitigation plan information called for in OAR 635-415-0020(8). LUBA agreed with ODFW, and petitioners assert on judicial review that LUBA misconstrued what ORS 215.446 requires by concluding that it requires a mitigation plan to include the OAR 635-415-0020(8) submittal requirements. We agree with petitioners that LUBA erred in its construction of ORS 215.446. With a construction of ORS 215.446 that correctly reflects the legislature's intent, we reverse and remand the matter to LUBA.

BACKGROUND AND PROCEDURAL HISTORY

*Legal Framework.* In 2019, the legislature passed House Bill (HB) 2329, which was codified as ORS 215.446. Or Laws 2019, ch 650, § 4.[1] ORS 215.446 provides standards for applicants seeking to develop midsize renewable energy facilities. Generally speaking, midsize renewable energy facilities are solar facilities that use a certain number of acres, depending on the type of land on which the applicant seeks to build, or geothermal or wind energy generation facilities that have a certain megawatt generating capacity. ORS 215.446(1)(c). As relevant here, an applicant seeking to develop a solar facility on nonarable land can avail itself of the application process under ORS 215.446 for sites that use

---

[1] The definitional section of ORS 215.446 was amended in 2021, Or Laws 2021, ch 60, § 1, but the changes are not relevant to the issues here and we use the current version of the statute.

more than 320 acres but not more than 1,920 acres. ORS 215.446(1)(c)(A)(iii).

Before ORS 215.446 was enacted, the Energy Facility Siting Council (EFSC) was solely responsible for permitting solar energy facilities that use more than 320 acres of nonarable land. ORS 469.300 (2019), *amended by* Or Laws 2019, ch 650, § 1. The renewable energy industry did not consider it financially feasible to develop midsize renewable energy facilities under the EFSC permitting process, which in their view is lengthy, cumbersome, and expensive. *See, e.g.*, Audio Recording, Joint Subcommittee on Natural Resources, HB 2329, June 10, 2019, at 38:42 (comments of Morrow County representative Don Russell, https://olis.oregonlegislature.gov (accessed Nov 12, 2021)). The industry was familiar with developing smaller scale solar facilities—320 acres or less—through a process in which counties were the permitting authority, and HB 2329 was advanced as an approach that would allow counties the authority to permit midsize renewable energy facilities. Yet, as it was for the EFSC permitting process, ODFW would have a role regarding protections for wildlife.

That desire for a faster and more responsive permitting process is embodied in subsections (2) and (3) of ORS 215.446:

"(2)   An application for a land use permit to establish a renewable energy facility must be made under ORS 215.416. An applicant must demonstrate to the satisfaction of the county that the renewable energy facility meets the standards under subsection (3) of this section.

"(3)   In order to issue a permit, the county shall require that the applicant:

"(a)(A)   Consult with the State Department of Fish and Wildlife, prior to submitting a final application to the county, regarding fish and wildlife habitat impacts and any mitigation plan that is necessary;

"(B)   Conduct a habitat assessment of the proposed development site;

"(C)   Develop a mitigation plan to address significant fish and wildlife habitat impacts consistent with

the administrative rules adopted by the State Fish and Wildlife Commission for the purposes of implementing ORS 496.012; and

"(D)   Follow administrative rules adopted by the State Fish and Wildlife Commission and rules adopted by the Land Conservation and Development Commission to implement the Oregon Sage-Grouse Action Plan and Executive Order 15-18."

Hence, in enacting ORS 215.446, the legislature placed in the hands of counties an alternative permitting process for proposed midsize solar facilities. Developers can still seek permitting for midsize solar facilities under the EFSC process. ORS 215.446(2). Under ORS 215.416, a county must approve permits that fit within the county's comprehensive plan and zoning ordinances. ORS 215.416(4)(a). Moreover, a county has 150 days from the completion of an application to make its determination. ORS 215.427(1). Typically, permitting by EFSC takes much longer.

As for mitigation of impacts to wildlife, an applicant seeking a solar facility permit under ORS 215.446 must do three things: (1) consult with ODFW about the impacts the proposed site will have on fish and wildlife, and if necessary, develop a mitigation plan; (2) conduct a habitat assessment; and (3) "[d]evelop a mitigation plan to address significant fish and wildlife habitat impacts consistent with the administrative rules adopted by the State Fish and Wildlife Commission for the purposes of implementing ORS 496.012."[2]

ORS 496.012, also known as the state's Wildlife Policy, declares that "wildlife shall be managed to prevent serious depletion of any indigenous species and to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state." To advance the Wildlife Policy, the Fish and Wildlife Commission has adopted rules, chapter 635, division 415, which are known as ODFW's Mitigation Policy. *See* OAR 635-415-0000 ("The purpose of these rules is to further the Wildlife Policy (ORS 496.012) * * * of the State of Oregon through the application

---

[2] If sage grouse are involved, ORS 215.446(3)(a)(D), an applicant must do a fourth thing.

of consistent goals and standards to mitigate impacts to fish and wildlife habitat caused by land and water development actions."); OAR 635-415-0010 ("It is the fish and wildlife habitat mitigation policy of the Oregon Department of Fish and Wildlife to require or recommend, depending upon the habitat protection and mitigation opportunities provided by specific statutes, mitigation for losses of fish and wildlife habitat resulting from development actions.").

Two of the Mitigation Policy's rules in particular are implicated here: OAR 635-415-0025 and OAR 635-415-0020. OAR 635-415-0025 sets out six habitat categories, with "Habitat Category 1" as the most protective category (for irreplaceable and essential habitat, the mitigation goal is no loss of habitat) and "Habitat Category 6" as the least protective (habitat that has low potential to become essential habitat for wildlife and where the mitigation goal is to minimize impacts to wildlife). Habitat Categories 3 and 4 are habitats that are essential or important for wildlife.[3] For both habitat categories, ODFW must act to achieve the mitigation goals by "recommending or requiring":

"(A)   Avoidance of impacts through alternatives to the proposed development action; or

"(B)   Mitigation of impacts, if unavoidable, through reliable in-kind,[4] in-proximity habitat mitigation to achieve no net loss in either pre-development habitat quantity or quality. Progress towards achieving the mitigation goals and standards shall be reported on a schedule agreed to in the mitigation plan performance measures. The fish and wildlife mitigation measures shall be implemented and completed either prior to or concurrent with the development action."

OAR 635-415-0025(4). That is, Habitat Categories 3 and 4 have mitigation goals of "no net loss" of habitat.[5]

---

[3] ODFW has the view that Habitat Categories 3 and 4 apply to the proposed site. West Prineville agrees that Habitat Category 4 applies. In any event, all parties agree that the applicable mitigation standard is achieving "no net loss" of habitat.

[4] "Out-of-kind" or "off-proximity" mitigation is not permitted for Habitat Category 3.

[5] "Net Loss" means "a loss of habitat quantity and/or habitat quality resulting from a development action despite mitigation measures having been taken." OAR 635-415-0005(22).

OAR 635-415-0020 begins by describing the actions that ODFW is authorized to undertake. For ODFW's own development actions that impact fish and wildlife habitat, the department must "*provide* mitigation consistent with the goals and standards of OAR 635-415-0025." OAR 635-415-0020(1) (emphasis added). For instances when ODFW has "statutory authority to require mitigation as a condition of a permit or order," the department must "*require* mitigation consistent with the goals and standards of OAR 635-415-0025." OAR 635-415-0020(2) (emphasis added). For "other than" ODFW actions, when "[f]ederal or state environmental laws or land use regulations authorize or require mitigation for impacts to fish and wildlife," the department must "*recommend* mitigation consistent with the goals and standards of OAR 635-415-0025." OAR 635-415-0020(3)(a) (emphasis added).

Depending on what ODFW is authorized by statute to do, it may recommend or require mitigation of habitat impacts of a development action based on a number of considerations: (a) the location, physical and operational characteristics, and duration of the proposed development action; (b) the alternatives to the proposed development action; (c) the fish and wildlife species and habitats that will be affected by the proposed development action; and (d) the nature, extent, and duration of impacts expected to result from the proposed development action. OAR 635-415-0020(4)(a)-(d).

In addition to those considerations, and of particular relevance to LUBA's conclusions in its final order, OAR 635-415-0020(8) provides:

"In addition to any other information that may be required by law, a written mitigation plan prepared for the Department shall:

"(a)   Include the information required in OAR 635-415-0020(4)(a)-(d); and

"(b)   Describe the mitigation actions which shall be taken to achieve the fish and wildlife habitat mitigation goals and standards of OAR 635-415-0025; and

"(c)   Describe and map the location of [t]he development action and mitigation actions including the latitude and

longitude, township, range, section, quartersection and county; and

"(d)   Complement and not diminish mitigation provided for previous development actions; and

"(e)   Include protocols and methods, and a reporting schedule for monitoring the effectiveness of mitigation measures. Monitoring efforts shall continue for a duration and at a frequency needed to ensure that the goals and standards in OAR 635-415-0025 are met, unless the Department determines that no significant benefit would result from such monitoring; and

"(f)   Provide for future modification of mitigation measures that may be required to meet the goals and standards of OAR 635-415-0025; and

"(g)   Be effective throughout the project life or the duration of project impacts whichever is greater.

"(h)   Contain mitigation plan performance measures including:

"(A)   Success Criteria. The mitigation plan must clearly define the methods to meet mitigation goals and standards and list the criteria for measuring success;

"(B)   Criteria and a timeline for formal determination that the mitigation goals and standards have been met;

"(C)   Provisions for long-term protection and management of the site if appropriate;

"(D)   A reporting schedule for identifying progress toward achieving the mitigation goals and standards and any modification of mitigation measures. Mitigation goals and standards must be achieved within a reasonable time frame to benefit the affected fish and wildlife species."

*Procedural History.* Solar Farm consulted with ODFW before submitting its mitigation plan to the county's planning commission. Solar Farm, having used ODFW's COMPASS Habitat Mapping Tool (COMPASS), characterized the site as Habitat Category 6. Although Solar Farm assessed the proposed site as having "low habitat quality" for big game, it nevertheless acquiesced to ODFW's view that the land was a higher quality of habitat (a combination of Habitat Categories 4 and 5) and agreed to a 1:1 mitigation

ratio (for every acre impacted by the development, one acre of mitigation would be required). Solar Farm's mitigation plan (the V2 Plan) included two options, summarized as follows:[6]

- Option 1. Because western juniper has significantly expanded its range and encroached landscapes dominated by shrubs and herbaceous vegetation and negatively affects ecosystems, a "final mitigation plan will be prepared" before construction of the proposed solar facility to cull encroaching juniper at some location in Crook County, which would ultimately provide forage for big game. The to-be-developed final mitigation plan would include, among other things, success criteria, durability measures, and a reporting schedule.

- Option 2. A one-time payment to the Deschutes Land Trust (or a similar land trust) to aid its Crook County conservation initiatives. The amount of the payment would be determined by a formula used for other similar solar facility projects in the surrounding area.

ODFW and the Department of Land Conservation and Development (DLCD) jointly submitted comments to the county's planning commission about Solar Farm's V2 Plan. The agencies asserted that the V2 Plan was insufficiently specific about the needed measures to achieve "no net loss" to mitigate impact to wildlife. To begin with, the agencies disagreed with Solar Farm's assessment of the habitat as Category 6 and asserted that Solar Farm mistakenly used COMPASS. The agencies expressed their belief that the project needed a site-specific assessment and, based on what they knew of the site, classified the additional 334 acres as Habitat Category 3 or Habitat Category 4 (OAR 635-415-0025(3) and (4)), given its importance for a variety of wildlife, including reptiles, small mammals, and migratory birds.

---

[6] The V2 Plan also proposed a third mitigation option, which were unspecified alternative mitigation measures to be developed "in consultation" with ODFW, subject to that agency's "reasonable approval." The agencies recommended that Option 3 be omitted from final approval, to which the county agreed.

With that in mind, the agencies made recommendations. They were of the view that Option 1—juniper removal—was inadequate, among other things, because it lacked the informational requirements set out in ORS 635-415-0020(8), including assurances that mitigation actions will offset adverse impacts and the identification of a specific mitigation site. As to Option 2, the agencies, citing OAR 635-415-0020(8)(c) (requiring description and map of the mitigation action), recommended the inclusion of a specific project area for which the one-time mitigation payment would benefit. They also recommended that Solar Farm provide documentation that Deschutes Land Trust was willing to accept responsibility for the mitigation measures that the one-time payment contemplated.

The county's planning commission approved the modification of the CUP. ODFW appealed the decision to the Crook County Court.[7] The county court held a hearing on the application and concluded that Options 1 and 2 were specific enough to ensure appropriate mitigation for the proposed solar-facility site. The county court noted that the applicant and ODFW agreed that a 1:1 ratio of mitigating one acre for every acre of solar facility development was appropriate, characterizing the mitigation plan as a "no net loss" mitigation standard, but recognized that there was disagreement between the applicant and ODFW on the implementation of the "no net loss" standard. The county court, however, found that there was substantial evidence that V2 Plan addressed significant fish and wildlife habitat impacts and was consistent with the Mitigation Policy. Moreover, the county court, relying on OAR 660-033-0130(38)(j) (a set of DLCD rules that set standards for approval of solar facilities on nonarable land of *320 acres or less*), concluded that Solar Farm's V2 Plan was "appropriate." OAR 660-033-0130 (38)(j)(G) (providing, in part, that, "[w]here the applicant and the resource management agency cannot agree on what mitigation will be carried out, the county is responsible for determining *appropriate mitigation*, if any, required for the

---

[7] The Crook County Court is the governing body for Crook County and is comprised of a county judge and two county commissioners. ORS 203.111; ORS 376.005.

facility" (emphasis added)).[8] In the county court's view, the mitigation options were in line with mitigation approaches taken by other solar facilities in the area and consistent with the county court's prior decisions.

ODFW petitioned for LUBA review of the county's decision, arguing that the county court improperly construed ORS 215.446(3)(a)(C) when it determined that the V2 Plan satisfied that statute's requirements. It argued that the V2 Plan failed to meet the Mitigation Policy's definition of "mitigation plan" because it failed to "thoroughly describe the manner in which" implementing the no net loss standard would occur. OAR 635-415-0005(18). ODFW also argued that the V2 Plan failed to satisfy the requirements of OAR 635-415-0020(8), specifically the information required by OAR 635-415-0020(8)(c), (g), (h)(A), (h)(B), and (h)(D). Without that information, ODFW asserted, the V2 Plan was not consistent with the Mitigation Policy and did not support a conclusion that its implementation would result in no net loss of habitat quality and quantity.

Solar Farm responded with its view that ORS 215.446(3)(a)(C) did not require that a mitigation plan be consistent with all of the provisions of the Mitigation Policy, in particular, the requirements set out in OAR 635-415-0020(8). The county court, according to Solar Farm, was not required to determine consistency with OAR 635-415-0020(8), because that rule is limited to situations in which ODFW is the permitting authority.

LUBA agreed with ODFW, concluding that the plain language of ORS 215.446(3)(a)(C) requires a mitigation plan that "is consistent with" *all* of the Mitigation Policy's provisions, including those set out in OAR 635-415-0020(8). LUBA reasoned that, because all of the rules in the Mitigation Policy state that they implement ORS 496.012, those rules are "'adopted *** for the purposes of implementing ORS 496.012.'" (Quoting ORS 215.446(3)(a)(C).) LUBA stated that Solar Farm's construction of ORS 215.446 (3)(a)(C) "essentially inserts the phrase 'it deems applicable'

---

[8] Petitioners do not argue on review that the DLCD rules that apply to solar facility projects that are 320 acres or less also apply to solar facility applications and review for projects made under ORS 215.446.

after the phrase 'administrative rules adopted by the State Fish and Wildlife Commission for the purposes of implementing ORS 496.012.'" LUBA added that the "legislature did not limit the universe of rules with which an applicant must demonstrate consistency to only those rules that the county determines apply." Additionally, LUBA concluded that it was not persuaded by Solar Farm's additional arguments concerning context, namely, that ORS 496.446(2) provides that an "applicant must demonstrate to the *satisfaction of the county*" that the proposed facility meets the standards set out in subsection (3). (Emphasis added.) LUBA said that that subsection does not permit the county to determine *which* of the Mitigation Policy's rules apply.

With that decided, LUBA also concluded that the V2 Plan failed to meet OAR 635-415-0020(8)(g)'s requirement that a mitigation plan be "effective throughout the project life or the duration of the project impacts whichever is greater" and OAR 635-415-0020(8)(h)'s requirement that a mitigation plan include certain performance measures. Moreover, LUBA concluded that the county's findings neither adequately explained the justification for the approval of the V2 Plan, ORS 215.416(9), nor adequately responded to specific issues raised by ODFW. LUBA remanded the decision to the county. Petitioners now seek judicial review of LUBA's order.

## STANDARD OF REVIEW

ORS 197.850(9) requires us to "reverse or remand" LUBA's order if it is "unlawful in substance," which occurs if it "represent[s] a mistaken interpretation of the applicable law." *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001). The issue on review—what ORS 215.446 requires of a mitigation plan—reduces to a matter of statutory construction, and we therefore review LUBA's opinion for legal error. To do so, we use the *PGE/Gaines* methodology, which requires us to examine the relevant text of ORS 215.446 in context, along with any relevant legislative history or other aids to construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *Trautman/Conte v. City of Eugene*, 280 Or App 752, 758, 383 P3d 420 (2016) ("Because LUBA's legal conclusions involve

an issue of statutory construction, we apply the principles of statutory construction set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), *as modified by* [*Gaines*, 346 Or at 171-72.]). When we interpret terms that are not defined by statute, we typically resort to dictionary definitions to discern their "plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. Further, when our review involves statutory construction, we must interpret statutory provisions correctly, regardless of how the parties have asserted their interpretations. *Gunderson, LLC v. City of Portland*, 352 Or 648, 662, 290 P3d 803 (2012) (citing *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997)).

## DISCUSSION

Solar Farm, on judicial review, raises five assignments of error. In its first assignment of error, Solar Farm argues that LUBA erred by requiring "strict compliance" with the Mitigation Policy. In its second assignment, Solar Farm contends that LUBA erred by concluding that ORS 215.446 requires "strict compliance" with the Mitigation Policy as ODFW interprets it. In its third assignment, Solar Farm argues that LUBA erred by concluding that the V2 Plan failed to satisfy ORS 215.446 and remanding the county's approval of the V2 Plan. Solar Farm, in its fourth and fifth assignments of error, argues in the alternative—in the event we agree with LUBA's construction of ORS 215.446—that LUBA interpreted OAR 635-415-0020(8) in such a way so as to allow ODFW to dictate the manner of evidence required to satisfy that rule, and that LUBA erred by making its own findings whether the requirements of OAR 635-415-0020(8) were satisfied. Crook County also weighs in, arguing that LUBA erred in concluding that the items set out in OAR 635-415-0020(8) were mandatory approval criteria for mid-size solar facility applicants. In addition to briefing from petitioners, three industry groups, Community Renewable Energy, Oregon Solar Energy, and Renewable Northwest, have supplied *amicus* briefing to argue that LUBA misconstrued ORS 215.446. ODFW defends LUBA's construction of ORS 215.446, mainly by arguing that the text of that statute plainly means that all of the Mitigation Policy rules apply to applicants.

Before we begin our analysis, we pause to make two points to help frame the parties' dispute. *First*, the parties' clash over the construction of ORS 215.446 reflects simpler arguments that the parties have asserted from the beginning of this dispute. For petitioners' part, they view ODFW's efforts—by insisting that certain rules of the Mitigation Policy apply, pressing its interpretation of the rules, and asserting that the V2 Plan failed to satisfy them—as an attempt to usurp the decisional authority of the county. As for ODFW, the department views the V2 Plan as lacking because it is merely "a plan to submit a plan" and fails to adequately convey how the impacts of Solar Farm's solar facility on wildlife will be mitigated. And, because the county has approved Solar Farm's application, when the final mitigation plan is ultimately submitted to the county, there will be no forum or opportunity for state agencies or other concerned parties to object to it.

*Second*, Solar Farm advances a theme that LUBA has demanded "strict compliance" with the Mitigation Policy and ODFW's interpretation of it. Although that characterization is somewhat understandable given LUBA's view of ORS 215.446 and its agreement with many of ODFW's positions, those are Solar Farm's words, not LUBA's. The crux of LUBA's decision is that ORS 215.446(3)(a)(C)—requiring a mitigation plan to "address significant fish and wildlife habitat impacts consistent with" the Mitigation Policy—requires an applicant to include the informational requirements described in OAR 635-415-0020(8). Petitioners' arguments and assignments of error flow from that key conclusion by LUBA, and, consequently, we confine our review to deciding whether that conclusion was correct and addressing how a mitigation plan submitted for ORS 215.446 compliance is consistent with the Mitigation Policy. We begin with a discussion of the relevant significant terms contained in ORS 215.446.

"*To the satisfaction of the county*." Approval of an application by the county is central to the approval framework under ORS 215.446. The purpose of the statute was to provide county approval as an alternative to EFSC permitting for midsize renewable energy facilities. ORS

215.446(2) provides that applications "for a land use permit to establish a renewable energy facility must be made under ORS 215.416," which sets out notice and related procedural requirements for county action on permits that are subject to discretionary approval. *See Flowers v. Klamath County*, 98 Or App 384, 386, 780 P2d 227, *rev den*, 308 Or 592 (1989). Further, subsection (2) provides that an "applicant must demonstrate to the satisfaction of the county that the renewable energy facility meets the standards under subsection (3) of this section." When those two sentences are considered together, it is plainly evident that the county is the decisionmaker for a permit allowing a renewable energy facility under ORS 215.446 and that an applicant prepares a mitigation plan for the county's approval.

      "*Consistent with*." As stated earlier, ORS 215.446 (3)(a)(C) provides that a county must require an applicant to

> "[d]evelop a mitigation plan to address significant fish and wildlife habitat impacts consistent with the administrative rules adopted by the State Fish and Wildlife Commission for the purposes of implementing ORS 496.012[.]"

As to the ordinary meaning of "consistent with," we turn to the term's dictionary definition. "Consistent" is defined as "marked by agreement and concord <opinions *consistent* with each other> : coexisting and showing no noteworthy opposing, conflicting, inharmonious, or contradictory qualities or trends : COMPATIBLE—usually used with *with*."[9] That is, "consistent with" connotes that two things are concordant with each other and that they lack noteworthy conflicting elements or qualities. That meaning alone, however, does not answer the question of what the legislature intended when it provided that mitigation plans are to be prepared as part of an application under ORS 215.446 and, specifically, whether the legislature intended that a mitigation plan includes the information set out in OAR 635-415-0020(8).

      LUBA construed the phrase "[d]evelop a mitigation plan to address significant fish and wildlife impacts

---

[9] *Merriam-Webster Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/consistent (accessed Oct 24, 2021) (definition of consistent).

consistent with the administrative rules" of the Mitigation Policy to mean all of rules of the Mitigation Policy, including OAR 635-415-0020(8). It reasoned that to do otherwise would essentially insert the phrase "as applicant deems applicable" after the phrase "administrative rules adopted by [ODFW] for the purposes of implementing ORS 496.012." *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted."). However, Solar Farm and the county do not arrive without reason to their view that the applicable "administrative rules" do not include OAR 635-415-0020(8). Rather, petitioners assert that context and the legislative history of ORS 215.446 compel that view. We turn to those arguments.

*Context*. Although we agree with LUBA that "consistent with" the rules of ODFW's mitigation policy does not mean that an applicant or the county approving the application for a solar facility gets to determine *which* rules apply, we proceed to explain that, once ORS 215.446 is considered in relation to how the rules of the Mitigation Policy operate as a whole, compliance with those items set out in OAR 635-415-0020(8) is not a requirement of the application process under ORS 215.446.

The informational requirements set out in OAR 635-415-0020(8) are prefaced by the statement that, "[in] addition to any other information that may be required by law, a written mitigation plan *prepared for the Department* shall [contain the information set out in paragraphs (a)-(h)]." (Emphasis added.) In other words, subsection (8) plainly indicates that the information required under that rule is for when an application is prepared for ODFW. An application made under ORS 215.446 is prepared for the county. To be sure, under ORS 215.446(3)(a), an applicant must consult with ODFW before it submits its application to the county, which is the approving entity, but that provision cannot be understood to say that an applicant's mitigation plan is prepared for ODFW. A construction of ORS 215.446 that says that an applicant must comply with the information requirements set out in OAR 635-415-0020(8) would

need to substitute "the county" in place of "the Department." That substitution strikes a discordant note by requiring application of that rule when it was adopted by the Fish and Wildlife Commission for the purpose of ODFW's own use when the department is the permitting authority.

Additionally, OAR 635-415-0020(8) is a rule that sets out a circumstance for when ODFW *requires* certain information for mitigation plans. That is not the case here, where the development action is neither ODFW's own action nor is it an action in which ODFW has statutory authority to require mitigation measures. *See* OAR 635-415-0020(1), (2). Rather, ODFW's own rule—OAR 635-415-0020(3)—states that the department must "*recommend* mitigation consistent with the goals and standards of OAR 635-415-0025" when the two foregoing scenarios do not apply and a state environmental law or land use regulation, like ORS 215.446, requires mitigation for impacts to fish and wildlife.

Other rules contained in the mitigation policy allow for ODFW to recommend *or* require a mitigation action (depending on the statutory authority that requires a mitigation plan). *See* OAR 635-415-0025(1)-(6); OAR 635-415-0020(4) (requiring ODFW to consider certain factors when it is making a recommendation or requiring something for a development action). To us, that suggests that, because OAR 635-415-0020(8) speaks to situations in which something is *required*, it is not a rule of the mitigation policy that applies to *all* situations in which ODFW is involved in furthering the state's wildlife policy and applications that require mitigation plans.

Accordingly, rules in the Mitigation Policy create different obligations for applicants depending whether ODFW is requiring mitigation, based on statutory authority, or whether ODFW is recommending mitigation to other permitting authorities. Here, ORS 215.446 provides that a county is the permitting authority. When the legislature enacted ORS 215.446, those distinctions were in place. There is nothing in the text of ORS 215.446 that suggests that the legislature intended to modify those distinctions. Therefore, the phrase "the administrative rules adopted by the State Fish and Wildlife Commission for the purposes of

implementing ORS 496.012," ORS 215.446(3)(a)(C), refers to rules in which ODFW is not the permitting authority, and those rules do not include OAR 635-415-0020(8).

*Legislative history.* EFSC was formerly the sole permitting authority for solar facilities 320 acres or greater in size. The proponent of HB 2329, Representative Ken Helm, was asked during a meeting of the Joint Subcommittee on Natural Resources if counties would be using the same wildlife mitigation criteria as EFSC used. Representative Helm responded, "The bill intends that, yes." Audio Recording, Joint Subcommittee on Natural Resources, HB 2329, June 10, 2019, at 23:24 (comments of Rep Ken Helm), https://olis.oregonlegislature.gov (accessed Nov 12, 2021). Representative Helm also explained that HB 2329 created an approval process—different from the county approval process for smaller solar facilities—"in which the county would administrate the approval process, but this bill includes particular requirements that mirror the EFSC criteria—not necessarily the process, but the criteria." Audio Recording, Joint Subcommittee on Natural Resources, HB 2329, June 10, 2019, at 21:40 (comments of Rep Ken Helm) https://olis.oregonlegislature.gov (accessed Nov 12, 2021). The relevant EFSC criteria to which Helm referred is set out in OAR 345-022-0060:

> "To issue a site certificate, the Council must find that the design, construction and operation of the facility, taking into account mitigation, are consistent with:
>
> "(1)  The general fish and wildlife habitat mitigation goals and standards of OAR 635-415-0025(1) through (6) in effect as of February 24, 2017[.]"

EFSC's rule does not require the OAR 635-415-0020(8) submittal information. To impose the additional submittal requirements of OAR 635-415-0020(8) for ORS 215.446 permitting would impose procedural hurdles for applications made under ORS 215.446 above those required for EFSC permitting. The legislative history indicates that that was not the legislature's intent.

Consequently, although all the rules of the Mitigation Policy have the purpose of implementing ORS 496.012—the

Wildlife Policy—not all the rules are applicable when ODFW is not the permitting authority. With the text, context, and legislative history of ORS 215.446 considered together, subsection (3)(a)(C) does not require an applicant to include the information set out in OAR 635-415-0020(8). Given the framework of the Mitigation Policy, in which certain rules are intended for ODFW's own approval process, nothing in ORS 215.446 suggests that ODFW requirements or submittal rules meant for ODFW's approval were intended by the legislature to apply to the county approval process for mid-size renewable energy facilities. LUBA's order, however, concluded that the submittal information set out in OAR 635-415-0020(8), which is information that must be provided in applications prepared for ODFW, are requirements that an applicant must include to demonstrate to the county's satisfaction under ORS 215.446 that the mitigation plan is consistent with the Mitigation Policy. That conclusion is unlawful in substance, and we therefore reverse and remand the petition to LUBA.

The parties' arguments focus on the role of OAR 635-415-0020(8), and we have concluded that ORS 215.446 does not require an applicant to include that rule's submittal requirements. Left open, however, is the question of what "consistent with" the Mitigation Policy *does* require. Given the limited nature of the parties' arguments, we do not endeavor to provide a conclusive, all-encompassing construction of what a mitigation plan prepared for an application under ORS 215.446 requires, but we do offer the following observations, as relevant to issues the parties raise on review that LUBA will consider on remand.

Petitioners contend that an ORS 215.446 application for a solar facility must include a mitigation plan that applies the goals and standards of OAR 635-415-0025. That view is largely correct, but we highlight elements of OAR 635-415-0025 and other provisions of the Mitigation Policy that must be considered when a county makes a determination that a mitigation plan is "consistent with" the Mitigation Policy.

First, the Mitigation Policy defines "Mitigation Plan" (ORS 215.446(3)(a)(C) requires that an applicant must

develop a "mitigation plan" consistent with the Mitigation Policy) as

> "a written plan or statement that *thoroughly describes the manner* in which the impact of a development action *will be* reduced or eliminated over time, avoided, and/or minimized; and the affected environment, including fish and wildlife habitat, monitored, restored, rehabilitated, repaired and/or replaced or otherwise compensated for in accordance with OAR 635-415-0010 of these rules."

OAR 635-415-0005(18) (emphases added). The emphasized terms—"thoroughly describes the manner" and "will be"—indicates that specificity and definiteness are required for a mitigation plan to be consistent with the Mitigation Policy. That is, the term "will be" connotes a definiteness of future action and the term "thorough" connotes that the mitigation plan requires completeness and attention to detail.[10] When a county assesses whether a mitigation plan is "consistent with" the Mitigation Policy, it must determine whether the plan has those qualities.

Also notable are the standards set out for each Habitat Category. OAR 635-415-0025. Petitioners have accepted that the *goals* for Habitat Categories 3 and 4—"no net loss" in both cases—are appropriate criteria for Solar Farm's mitigation plan. (For example, the mitigation goal for Habitat Category 4 "is no net loss in either existing habitat quantity or quality." OAR 635-415-0025(4)(a).) In addition to a goal, each Habitat Category has a directive. For instance, Habitat Category 4 directs ODFW to

> "achieve the mitigation goal for Category 4 habitat by recommending or requiring:
>
> "(A) Avoidance of impacts through alternatives to the proposed development action; or
>
> "(B) Mitigation of impacts, if unavoidable, through reliable in-kind or out-of-kind, in-proximity or off-proximity habitat mitigation to achieve no net loss in either predevelopment habitat quantity or quality. Progress towards

---

[10] "Thorough" means "marked by completeness: such as *** carried through to completion especially with full attention to details : COMPLETE <a thorough search>[.]" *Merriam-Webster Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/thorough (accessed Oct 24, 2021).

> achieving the mitigation goals and standards shall be reported on a schedule agreed to in the mitigation plan performance measures. The fish and wildlife mitigation measures shall be implemented and completed either prior to or concurrent with the development action."

OAR 635-415-0025(4)(b). We note two things here. First, an ODFW recommendation furthers the Mitigation Policy by seeking a mitigation plan that has (if an alternative development action is unavoidable) "*reliable* in-kind or out-of-kind, in-proximity or off-proximity habitat mitigation to achieve no net loss." OAR 635-415-0025(4)(b) (emphasis added). The Mitigation Policy therefore calls for reliable "no net loss" mitigation, *i.e.*, a mitigation measure "fit to be relied on."[11] Second, an ODFW recommendation to further "no net loss" mitigation reflects that, under the Mitigation Policy, a mitigation plan includes a schedule of performance measures.

Finally, we observe that OAR 635-415-0020(4) provides that ODFW's recommendations for mitigation of a development action's impact must be based, among other things, on the "location, physical and operational characteristics, and duration of the proposed development action" and the "nature, extent, and duration of impacts expected to result from the proposed development action." OAR 635-415-0020(4)(a), (d). The OAR 635-415-0020(4) considerations illustrate that the Mitigation Policy includes, regardless of ODFW's particular role, durational considerations as to the development action and the mitigation efforts. Ignoring those considerations would allow for mitigation measures that fail to accommodate the impact on habitat for the full life of a renewable energy facility.

With that said, we return to the meaning of "consistent with." A mitigation plan prepared for ORS 215.446 approval must be concordant with the Mitigation Policy and not show any substantive conflicting elements. Although a mitigation plan need not follow the submittal requirements set out in OAR 635-415-0020(8), there are other requirements of the Mitigation Policy that a mitigation plan must

---

[11] *Merriam-Webster Unabridged Dictionary*, https://unabridged.merriam-webster.com./unabridged/reliable (accessed Oct 24, 2021) (definition of reliable).

satisfy, including the ones that we have highlighted above. On remand, LUBA will consider those in the first instance.

Reversed and remanded.